UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

JANE DOE and JOHN DOE,
Co-Administrators of the Estate
of A.A.,

                                          AMENDED COMPLAINT

                         Plaintiffs,              JURY TRIAL DEMANDED

        -against-                       7:18 Civ. No. 11797-PMH

BEDFORD CENTRAL SCHOOL DISTRICT;
DR. CHRISTOPHER M. MANNO; SUSAN
OSTROFSKY; HELAYNA HERSCHKORN PACE;
and STEVEN QUINN,

                            Defendants.
-----------------------------------------------------------------X

Plaintiffs Jane Doe and John Doe, as co-administrators of the estate of A.A., by

and through their attorneys, Emery Celli Brinckerhoff & Abady LLP, for their Amended

Complaint allege as follows:

**BEDFORD CENTRAL SCHOOL DISTRICT DOES NOTHING
WHILE ITS STUDENT SPIRALS INTO SUICIDE**

1.      A.A. was a thirteen-year-old 8th grader at Fox Lane Middle School ("the

School") in Bedford, New York.  He was the loving son of Jane and John Doe ("Does" or

"Plaintiffs").  Though psychologically vulnerable, A.A. was a fine student and had a bright and

long future ahead of him.

2.      That all ended on December 18, 2017.

3.      When a student drafts suicide notes on his school email account, we

expect the school to help him.  When a student sends psychologically disturbed and suicidal

emails forwarded to a school psychologist, we expect the school to help him.  When a student

has an open and obvious psychological breakdown at school, we expect the school to *help* him: inform his parents, provide him with psychological assistance, do *something* to help him.

    4.    A.A. did all of the above, but this school—Defendant Bedford Central School District ("BCSD") and its employees—did not help him.  Defendants did nothing.

    5.    Defendants were on notice for years as to A.A.'s vulnerability and need for help.  A.A. had suffered severe and pervasive bullying at the School.  The School knew about it.  It did nothing.  A.A. suffered from Attention Deficit Hyperactivity Disorder and anxiety.  He had an IEP requiring the School to "notify [his] parents of any changes in behavior."  When A.A.'s first girlfriend broke up with him, A.A. had a massive public meltdown in the cafeteria and sent dozens of psychologically disturbed emails in school, in class, on the School server.  The School did not notify the Does.  Instead, School psychologist Helayna Herschkorn Pace ("Herschkorn") told them A.A. should stay away from his ex-girlfriend.

    6.    Even as Herschkorn was on the phone with A.A.'s parents, instructing them to keep A.A. away from his ex, A.A. was in the house, preparing to kill himself.  Had Herschkorn given John any warning as to A.A.'s psychological state, he could have saved his son.  Had Herschkorn given Jane any warning as to A.A.'s psychological state, she could have saved her son.  The Does could and would have stopped A.A. from ending his own life.

    7.    Herschkorn failed.  The School failed.  They let this boy die.  As a result of their failure, their indifference, their utter disregard for A.A.'s life and well-being, A.A. hanged himself by the neck from a ceiling pipe in the basement, and died.

    8.    No parents should ever have to bury their own child.  A.A.'s parents will live with the loss of their precious son for the rest of their lives.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  This action arises under the Fourteenth Amendment to the Constitution of the United States pursuant to 42 U.S.C. § 1983, the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq*., and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq*.

10.     Venue is proper in this district under 28 U.S.C. § 1391(b).

11.     On March 16, 2018, Plaintiffs filed a notice of claim against the Bedford Central School District, Christopher Manno, Susan Ostrofsky, and Helayna Herschkorn pursuant to General Municipal Law § 50-i.

12.     On June 5, 2018, Plaintiffs testified at a hearing pursuant to General Municipal Law § 50-h.

## THE PARTIES

13.     Plaintiffs JANE DOE and JOHN DOE reside in Westchester County in Mt. Kisco, NY.  They are the co-administrators of the estate of their deceased son, A.A., who died by suicide on December 18, 2017.  Before his death, A.A. attended the School in Bedford, New York.

14.     Defendant BEDFORD CENTRAL SCHOOL DISTRICT ("BCSD" or "the District") was at all relevant times the School District containing the School.  As such, the District was responsible for the safety, security, and well-being of students in BCSD schools, including A.A.

15.     Defendant DR. CHRISTOPHER M. MANNO was at all relevant times the Superintendent of the District.  As such, he was responsible for the safety, security, and well-being of students within the District, including A.A.

16.     Defendant SUSAN OSTROFSKY was at all relevant times the Principal of the School.  As such, she was responsible for the safety, security, and well-being of students within the School, including A.A.

17.     Defendant HELAYNA HERSCHKORN was at all relevant times a School Psychologist for Defendant BCSD, including the School.  As such, she was responsible for the safety, security, and well-being of students within the School, including A.A.

18.     Defendant STEVEN QUINN was at all relevant times a School Counselor for Fox Lane Middle School.  As such, he was responsible for the safety, security, and well-being of students within the School, including A.A.

19.      At all relevant times, all Defendants were state actors and acted under color of the laws, statutes and ordinances, regulations, policies, customs, and usages of the State of New York.

## FACTUAL ALLEGATIONS

20.     A.A., the eldest of Jane and John Doe's three children, was a gifted thirteen-year-old student in the 8th grade at the School, which he had attended since 6th grade.

21.     He loved playing the cello and performed with the School orchestra and the School's Sinfonietta ensemble.  Academically precocious with an exceptional talent for math, A.A. built his own 3D printer in 2017.

22.     During his time at the School, A.A. joined after-school clubs to advocate for victims of bullying, including Pride in Purple and C.A.T.C.H.  As a victim of persistent bullying himself, he empathized with other victims and worked to foster a tolerant school culture.  A.A. was in the process of obtaining a law merit badge through the Boy Scouts when he died.

23.     A.A. celebrated his bar mitzvah three weeks before his suicide on December 18, 2017.

I.     **A.A.'s IEP Required the School to Notify His Parents of "Any Changes in Behavior"**

24.      A.A. had a well-documented history of emotional volatility stretching back at least to 2013.

25.     A.A.'s Individualized Education Program (IEP) for the 2017-2018 school year noted A.A.'s diagnosis of "Attention Deficit Hyperactivity Disorder (ADHD), predominantly hyperactive impulsive type."

26.     A.A. had had IEPs each year since he was first diagnosed with ADHD at age four.

27.     A.A. also underwent a triennial psychiatric evaluation.

28.     A.A.'s November 2017 IEP progress report noted that he "was making less than anticipated progress" and "was initially apprehensive about attending counseling sessions."

29.     The 2017-2018 IEP contained one annual goal designed to address the volatility brought on by A.A.'s ADHD: "A.A. will practice strategies to manage emotional stress."

30.     The IEP recommended "consistent parent teacher communication."

31.     The IEP also required "teachers and counselor/psychologist" to "call or email the parents, as needed, in order to notify parents of any changes in behavior."

32.     Defendants BCSD, Manno, and Ostrofsky were responsible for ensuring that the School complied with student IEPs.

33.     Defendants ignored this legal requirement in the face of A.A.'s obvious distress throughout the fall of 2017 and the days before his death.

## II.    A.A. Is Bullied and Defendants Do Almost Nothing

34.     Beginning in late elementary school, A.A. was the target of pervasive harassment and bullying by other students at the School.  After these incidents, the Does attempted to ensure Defendants would punish the bullies and protect A.A.  But Defendants imposed no meaningful consequences on the perpetrators, and the bullying did not stop.

35.     In October 2017, two classmates attempted to hoist A.A. over a stairwell railing as he left the library.  Other boys stood by watching and recorded the incident on their cell phones.

36.     A.A. reported the assault to the librarian.

37.     On information and belief, the librarian informed administrators.

38.     Assistant Principal Mary Harrison told Jane that the bullies would have "the most severe consequences" and would not go near A.A. again.

39.     BCSD's code of conduct states that any student "who is found to have committed a violent act . . . shall be subject to suspension from school for at least five days."

40.     The perpetrators, however, returned to school two days later.

41.     Jane informed School employees Jeff Levin and Defendant Helayna Herschkorn via email that the assault was "traumatic" for A.A.

42.     A.A. became anxious and reluctant to return to campus.

43.     Later in October, two classmates—including one of the library perpetrators—tried to provoke A.A.by berating his female friend in front of him.  In November,

the same bully shoved A.A. into the side of a school bus.  A.A. told his parents about the assault

and asked them to call the police because, he said, "the school doesn't do anything!"

44. Jane reported both incidents to Harrison and Herschkorn, via email.

45. Harrison told Jane the bullies would face consequences.

46. On information and belief, no punishment was imposed.

47. Several weeks before A.A.'s death, one of the same bullies called A.A.'s

girlfriend B.B.[1] a "she-male" in A.A.'s presence.

48. Jane informed Harrison by phone.

49. Harrison again stated that the main bully would face consequences.

50. On information and belief, no punishment was imposed.

### III.    A.A. Begins Dating Classmate B.B.

51.  Shortly after A.A.'s bar mitzvah on November 25, 2017, A.A. began

dating his classmate B.B.  A.A. struggled socially and was thrilled to date for the first time; the

two exchanged many messages using their School email accounts and spent time together

outside of school.

52. According to School staff, these emails were monitored by software that

alerted administrators if certain words or phrases were used.

53. For instance, Principal Ostrofsky told the Does after A.A.'s death that

School software had alerted administrators to A.A.'s and B.B.'s use of the phrase "make out" in

their School email communication.

54. Manno and Ostrofsky were, among others, responsible to monitor student

internet activity on School devices, using School email accounts, or the School's internet server.

---

[1] For the purposes of this complaint, we identify A.A.'s classmate by the fictitious initials "B.B."

55.     On December 6 at 2:07 p.m., A.A. sent B.B. an email from his School account in which he described feeling "so depressed."

56.     The School did not notify A.A.'s parents about this email at any point before his death.

57.     On December 15, 2017, Defendant Ostrofsky informed A.A. and B.B. that they could not exchange personal emails using their School email accounts.

58.     A.A. then created a personal Gmail account for himself on which he and B.B. continued to email, including from their School-issued laptops on the School's internet server during School hours.

59.     On information and belief, Manno, Ostrofsky, and the other Defendants did nothing to monitor internet use of students—including A.A.—during School hours, at School and in class, using the School server, for non-School accounts.

## IV.     A.A. Spirals Towards Suicide While the School Does Nothing

60.     On the afternoon and evening of December 17, A.A. sent a number of emails to B.B. from his Gmail account in which he expressed anger and frustration about their unfolding break-up.  These messages featured vitriolic language and profanity.

61.     One email read:

> My fucking god if you think that I forced you to kiss me on Friday, I'm just fucking done with you.  In fact, I'm just fucking done with you.  You say you "need" someone who doesn't entice you, well I fucking need someone who knows what they want.  Someone who doesn't fucking change their mind when it's too late.  Someone capable of loving someone, not just the idea of someone.  If you fucking think that some perfect person is just going to pop out of thin air, then you need serious psychological help.  WE ARE FUCKING DONE, comprende?  Get the FUCK out of my life.  The present was an Aloe Vera specimen.  I went through the trouble of planting it, wrapped it up in a nice little box with a bow and a Happy Hanukkah card, and typed up a little instruction

booklet with how to care for it. I don't even know WHY the fuck I went to all the trouble. You are an ungrateful perfectionist and I doubt anyone will ever be good enough for you. I honestly feel bad for you.

62.    On December 18 at 7:52 a.m., B.B.'s mother forwarded the above message to Defendant Steven Quinn, School Counselor.

63.    She wrote in the body of the email: "Mr. Quinn – Here is an example of one of the emails sent last night."

64.    On information and belief, Defendant Quinn forwarded this email to Defendants Herschkorn and Ostrofsky or otherwise communicated its contents to them before approximately 3:00 p.m. on December 18.

65.    On December 18 at 4:15 p.m., B.B.'s mother forwarded a second email to Defendant Quinn, stating: "[B.B.] received this email from [A.A.] this evening. I feel that this kid needs some serious help, and he needs to stay away from [B.B.]. Please help me with this."

66.    The email read:

(Number 9!) Look him in the eye, aim no higher, summon all the courage you require, then count! (1, 2, 3, 4, 5, 6, 7, 8, 9! Number 10 paces, FIRE!). . . Sorry [B.B.], but this ones on you. I wish I could say that it wasn't your fault, but who am I kidding . . . It's totally your fault. Kill yourself so you can come down to hell where I am and apologize.

67.    These emails alerted Defendants to overt, alarming changes in A.A.'s behavior. Defendants did nothing in response.

68.    For example, Defendants did not send A.A.to a counselor.

69.    Before A.A.'s death, Defendants did not notify A.A.'s parents about the December 18, 7:52 a.m. email sent to the School.

70.    Before A.A.'s death, Defendants did not notify A.A.'s parents about the December 18, 4:15 p.m. email sent to the School.

71.    Defendants did not inform the Does about those forwarded messages until several weeks after A.A. died.

72.    Also on the morning of December 18, A.A. and B.B. used their School-issued computers to exchange an astonishing number of emails while at school, in class, using the School's internet server.

73.    For example, they exchanged approximately fifty emails during a period of forty-three minutes during their second-period English Language Arts class.

74.    These emails make plain that Defendants failed to supervise the students' in-class activity and the School failed to supervise their online activity on a school server, in school, and during school hours.

75.    A.A.'s mounting distress and anguish are apparent in the emails he sent B.B. during English Language Arts class.

76.    He wrote, "I fucking hate myself."

77.    He wrote, "I can't help but screw up my life no matter what goes right for me."

78.    Had Defendants monitored A.A. or A.A.'s online activity, they should have recognized the danger A.A. posed to himself.  But because of Defendants' free-for-all School email policy for students on non-School email accounts, they apparently did not monitor these emails.  They should have contacted the Does.  They should have done anything at all to protect A.A.  Defendants did nothing.

## V.    A.A. and B.B. Break Up as A.A.'s Suffering Increases

79.    During their lunch period on December 18, A.A. and B.B. had a public break-up in the school cafeteria.  On information and belief, A.A. paced the room in obvious distress, unable to sit or speak with friends or staff.  A lunch aide who observed the break-up alerted School staff to A.A.'s evident panic.

80.    No School staff member reached out to A.A. to support him that afternoon.

81.    The situation worsened after lunch.

82.    A.A. and B.B. exchanged approximately thirty emails on their school-issued computers, using the School's server, during their Science and Social Studies classes.

83.    These emails show A.A.'s continued decline into despair.

84.    He wrote, "Mr. Life?  Can I get a refund please?  Mine's broken."

85.    He wrote, "No one cares."

86.    He wrote, "[N]o one wants me."

87.    Defendants either failed to detect A.A.'s suicidal and red-flag-filled language or detected it and took no action.  Either way, no one intervened to help A.A. or inform his parents.

## VI.    Hours Before A.A.'s Death, Herschkorn Misleads the Does and Fails to Inform Them of A.A.'s Downward Spiral

88.    Sometime before 3:00 p.m. on December 18, 2017, Herschkorn left a voicemail message for Jane Doe.

89.    Herschkorn said: "Hi Mrs. [Doe], it's Helayna Herschkorn.  Hope you're doing well.  Couple things I wanted to talk to you about and I'll be here for, um, a little while longer, probably until 4 o'clock or so if you want to give me a call back today.  My number is [. .

11

.] okay, thanks, I look forward to catching up with you, bye."

90.    This message—delivered in a light, breezy tone—failed to communicate the seriousness of A.A.'s emotional state.

91.    Around 3:00 p.m. on December 18, 2017, Herschkorn called John and spoke with him.  Shortly thereafter, Jane returned Herschkorn's call and spoke with her.

92.    As Defendant Ostrofsky admitted after A.A.'s death, Herschkorn was aware at the time of those calls of the angry, profane email that had been forwarded by B.B.'s mother to Defendant Quinn.

93.    During both calls, Herschkorn's only stated concern was B.B.'s wellbeing.

94.    Defendant told the Does to instruct A.A. not to go near B.B.

95.    She said A.A. did not respect B.B.'s need for space and that he required a "cooling off" period.

96.    During both calls, Herschkorn did not notify A.A.'s parents about A.A.'s changes in behavior, including his radical spiral downwards that ultimately led to his death.

97.    During both calls, Herschkorn did not notify A.A.'s parents about the December 18, 7:52 a.m. email sent to the School.

98.    During both calls, Herschkorn did not notify A.A.'s parents about the extent of A.A.'s distress during the public break-up in the cafeteria, or any of his disturbed behavior throughout the day.

99.    During both calls, Herschkorn did not notify A.A.'s parents about any of his distressed emails sent in School, during class, using the School's server.

100.    During both calls, Herschkorn gave no indication whatsoever that A.A. was depressed, disturbed, emotionally volatile, or a suicide risk.

101.    Herschkorn misled both Jane and John to believe that A.A. was fine.

102.    Herschkorn's failure to notify A.A.'s parents of his dramatic changes in behavior violated A.A.'s IEP.

103.    Herschkorn's calls and voicemail occurred fewer than two hours before A.A.'s death.

104.    As a result of Defendants' failures to notify the Does about any of the above (*e.g.*, A.A.'s December 6, 2:07 p.m. email on his School account, the December 18, 7:52 a.m. email forwarded at least to Quinn and Herschkorn, the December 18, 4:15 p.m. email forwarded at least to Quinn, the public meltdown in the School cafeteria on December 18, the dozens of disturbed emails sent in School, in class, over the School server throughout December 18), as well as Herschkorn's affirmatively misleading phone calls indicating that A.A. was fine, A.A.'s parents had no idea that he was a suicide risk.

105.    The night before he died, A.A. told his parents that he and B.B might break up.  But A.A. did not seem upset.  Had Herschkorn or the School notified the Does as to A.A.'s *true* mental state—and had they not misled the Does into believing their son was fine—the Does would have intervened immediately to save their son's life.

106.    During the phone calls, Herschkorn also apologized for the delay in sending the Does a copy of A.A.'s October 2017 triennial psychological reevaluation.  She assured them a copy of the report was in the mail.  But the Does did not receive the report until weeks after A.A.'s death.  Only then did they realize that the report contained several red flags—markers of A.A.'s depression and anxiety that could have identified A.A. as a suicide risk.

107.    For example, the report described A.A.'s evaluation responses as "yield[ing] concerns in the 'at risk' range for depression symptoms," as A.A. indicated that he sometimes felt "that life is not worth living" and "like his life is getting worse and worse."

108.    A.A. also indicated that he "almost always feels stressed" and "often feels anxious, sad, depressed, and lonely."

109.    Herschkorn had called Jane on October 22, 2017—the day the evaluation was taken—but failed in the call to communicate to Jane critical details about A.A.'s responses and failed to ensure that Jane was aware of the urgency and significance of A.A.'s responses. Herschkorn misled Jane as to the seriousness of A.A.'s condition, as reflected in the evaluation.

110.    Defendants have never explained their failure to send the Does a copy of the report before A.A.'s death or their withholding of the report for weeks thereafter.

111.    Defendants' failure to notify the Does of A.A.'s worrisome behavior in the hours before his death violated his IEP, which provides that staff should notify the Does in the event of "*any* changes in behavior" (emphasis added).

112.    Before A.A. died, the School did not notify the Does of A.A.'s disturbed emails written on School computers using the School server.  They did not notify the Does of the extent and nature of A.A.'s panic during the lunchroom break-up.  They did not notify the Does on the morning of A.A.'s suicide about the emails Steven Quinn received from B.B.'s mother.

113.    Had Defendants followed A.A.'s IEP, the Does would have intervened immediately and saved their son.

114.    Notwithstanding A.A.'s obvious cries for help, Defendants also did nothing to help A.A., including sending him to a counselor or other adviser, to get him help during the last days of his life.

14

## VII.   A.A. Writes Suicide Notes on His School Account, then Hangs Himself

115.   Between 3:09 p.m. and 3:29 p.m. on December 18, 2017, A.A. wrote four emails saved on his School email account.

116.   All four messages had the word "SUICIDE" in the subject line in capital letters.

117.   His 3:09 p.m. email, addressed (but apparently not sent) to a teacher, said: "Hi Ms. Filner- I'm sorry this had to happen, but I just wanted you to know-it wasn't your fault. I was beyond help. There was nothing you could have done that wouldn't have made it worse. Sorry.  –[A.A.]"

118.   Defendants did not inform A.A.'s parents about any of the four "SUICIDE" emails sitting in his School account before A.A. died.

119.   Defendants did not take any action to help A.A. as a result of the four "SUICIDE" emails.

120.   Either the School failed to monitor A.A.'s School account, or it monitored the School account and failed to take any action.  Either way, the School's failure is egregious.

121.   Just after 4:00 p.m. on December 18, 2017, A.A. sent a suicide note to B.B. from his Gmail account.  The subject line read: "Suicide."  The body read, *inter alia*:

> Sorry [B.B.], but this ones on you.  I wish I could say that it wasn't your fault, but who am I kidding . . . It's totally your fault.  Kill yourself so you can come down to hell where I am and apologize.

122.   B.B. showed the message to her mother.

123.   At 4:15 p.m. on December 18, 2017, B.B.'s mother forwarded this email to Defendant Quinn.

15

124.     The School did not inform A.A.'s parents about this email before A.A.
died.

125.     Apparently, the School did nothing in response to this email before A.A.
died.

126.     Shortly after 4:30 p.m., Jane went to the basement of her home to check
on A.A.  She discovered his unconscious body hanging by the neck from a ceiling pipe.  A.A.
was taken by ambulance to the hospital.

127.     At 6:38 p.m., A.A. was pronounced dead.

128.     Had Defendant Herschkorn, the School, or any of the Defendants
informed either Jane or John about the above, they would immediately have intervened and
saved A.A.'s life.

**COUNT ONE**
(Substantive Due Process/42 U.S.C. § 1983 against
Defendants Manno, Ostrofsky, Herschkorn, and Quinn)

129.     Plaintiffs repeat and reallege as if fully set forth herein the allegations
contained in the foregoing paragraphs.

130.     Defendants Manno, Ostrofsky, Herschkorn, and Quinn, as personnel of
Fox Lane Middle School and/or Defendant BCSD, provided care and educational services to
A.A. and at all times acted under color of New York State law.

131.     By their conduct as set forth above, Defendants had actual knowledge of,
yet disregarded, an obvious or excessive risk of A.A.'s suicide.

132.     By failing to inform Plaintiffs about A.A.'s suicide notes and other
disturbed emails (including, *inter alia*, on his School account and those forwarded to the School
from his personal account), the extent of his obvious psychological breakdown at school, and his

disturbed emails and conduct at school; actively misleading A.A.'s parents as to his emotional

state in the hours before his death; failing to supervise A.A. properly while he was in their care;

failing to provide sufficient mental health care services for A.A.; evincing deliberate indifference

while failing to protect A.A. from severe and pervasive bullying at school of which they had

actual knowledge; failing to notify Plaintiffs of A.A.'s severe distress in the days before his

death; failing to comply with the IDEA and with A.A.'s IEP; failing to send A.A.'s triennial

evaluation to his parents before A.A. died; misleading A.A.'s parents as to its true contents;

failing to monitor and/or report A.A.'s disturbed online activity at School; and by their other

conduct as set forth above, Defendants shocked the conscience, were deliberately indifferent to

A.A.'s health and safety and to a serious and immediate risk of harm to him, increased the risk

that A.A. would kill himself, and egregiously departed from the exercise of reasonable

professional judgment, practice, and standards, in gross and wanton disregard of A.A.'s and

Plaintiffs' rights.

      133.   Because of Defendants' violations of A.A.'s constitutional rights, A.A.

endured pain and suffering, pre-death terror, mental anguish, anxiety, and lost life and enjoyment

of life.  In addition, A.A.'s distributees suffered and will suffer pecuniary and non-economic loss

resulting from the loss of love, comfort, society, attention, household and other services, and

support of A.A.

      134.   As a consequence, Plaintiffs are entitled to compensatory and punitive

damages against Defendants Manno, Ostrofsky, Herschkorn, and Quinn.

## COUNT TWO
(IDEA, 20 U.S.C. §§ 1400 *et seq.*/42 U.S.C. § 1983 against
Defendants Manno, Ostrofsky, Herschkorn, and Quinn)

135.    Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in the foregoing paragraphs.

136.    A.A.'s IEP required that Defendants notify Plaintiffs of "any changes in [A.A.'s] behavior."

137.    Defendants Manno, Ostrofsky, Herschkorn, and Quinn failed to alert Plaintiffs to obvious changes in A.A.'s behavior in the days before his death, including his spiral toward suicide.

138.    This failure violated A.A.'s IEP.

139.    Defendants' violation of A.A.'s IEP violated the IDEA.

140.    As a direct result of this failure, A.A. endured pain and suffering, pre-death terror, mental anguish, anxiety, and lost life and enjoyment of life, and his distributees/parents suffered the damages set forth above.

141.    As a consequence, Plaintiffs are entitled to compensatory and punitive damages against Defendants Manno, Ostrofsky, Herschkorn, and Quinn, as set forth above.

## COUNT THREE
(Negligence *per se* against all Defendants)

142.    Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in the foregoing paragraphs.

143.    A.A. belonged to the class of persons—students with disabilities—for whose benefit the IDEA was enacted.

144.    Suicide, like A.A.'s, is a type of harm the IDEA and A.A.'s IEP existed to prevent.

18

145.    As set forth above, Defendants, including Ostrofsky, Herschkorn, and Quinn, violated A.A.'s IEP and violated the IDEA.

146.    This violation of federal law was negligence *per se* under New York common law.

147.    Defendants' violation of the IDEA/negligence *per se* was a proximate cause of A.A.'s suffering and death, and the other damages set forth above.  Had Defendants notified A.A.'s parents about his changes in behavior, his disturbed emails and conduct, or his psychological spiral, A.A. would be alive today.

148.    As a consequence, Plaintiffs are entitled to compensatory and punitive damages against Defendants, as set forth above.

## COUNT FOUR
(Negligence against all Defendants)

149.    Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in the foregoing paragraphs.

150.    Because A.A. was under Defendants' care, supervision, and control, Defendants had a special relationship with A.A., and owed him a duty of adequate supervision.

151.    Defendants had a duty to use the highest degree of care in supervising, protecting, and monitoring the health, safety, and well-being of children in their school, including A.A.

152.    Defendants breached this duty by its misconduct set forth above.

153.    Defendant BCSD, as employer of each of the responsible individuals—Defendants Manno, Ostrofsky, Herschkorn, and Quinn—is responsible for their wrongdoing under the doctrine of *respondeat superior*.

154.    As a consequence, Plaintiffs are entitled to compensatory and punitive damages against Defendants, as set forth above.

## COUNT FIVE
(Wrongful Death pursuant to New York Estates, Powers,
and Trusts Law § 5-4.1 against all Defendants)

155.    Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in the foregoing paragraphs.

156.    A.A. died by suicide on December 18, 2017.

157.    By reason of the foregoing, Defendants' wrongful conduct was the proximate cause of A.A.'s death.

158.    Had A.A. survived, he could have sought legal redress against Defendants for their wrongful conduct.

159.    Plaintiffs sustained pecuniary and non-economic loss resulting from the loss of love, comfort, society, attention, services, and support of A.A.

160.    As a consequence, Plaintiffs are entitled to compensatory and punitive damages against Defendants.

## COUNT SIX
(Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794
against Defendant Bedford Central School District)

161.    Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in the foregoing paragraphs.

162.    At all times relevant to this action, Defendant Bedford Central School District received federal financial assistance to operate programs through and at the Fox Lane Middle School.

163.    A.A. was an otherwise qualified individual with a disability.

164.    A.A. qualified for benefits by virtue of his enrollment in Fox Lane Middle School.

165.    Defendant Bedford Central School District, acting with bad faith and gross misjudgment, discriminated against A.A. by reason of his disability, denied A.A. benefits (specifically, access to a free appropriate public education) because of his disability, and failed to ensure that A.A. was provided with the necessary and proper care and supervision or that employees of the Bedford Central School District would take all appropriate steps to ensure student safety and well-being, all in violation of the Rehabilitation Act.

166.    A.A.'s IEP required that Defendants notify Plaintiffs of "any changes in [A.A.'s] behavior."

167.    Defendants failed to alert Plaintiffs to obvious changes in A.A.'s behavior on December 18, 2017 before his death.

168.    This failure violated A.A.'s IEP and represented bad faith and gross misjudgment on the part of Defendant Bedford Central School District.

169.    A.A.'s IEP further noted that A.A. was not declassified for the 2017-2018 year because his "behavior, social skills, and emotional volatility have a significant impact." The IEP further notes that A.A. had "delays in social skills, attention and emotional self-regulation," which "interfere with his ability to access the general education curriculum."

170.    These issues required that A.A. receive one-on-one counseling from Defendant Herschkorn pursuant to his 2017-2018 IEP.

171.    According to the Fox Lane official Handbook, Defendants Quinn and Herschkorn were responsible for "overseeing" A.A.'s  "social and emotional well-being."

21

172.    As of the morning of December 18, 2017, Defendants Quinn, Herschkorn, and Ostrofsky and other District employees were aware of A.A.'s psychological conditions and deficits set forth in his IEP, his history of suicidal ideation earlier in 2017, his history of depression and emotional dysregulation, his history of being bullied by other school students, and his breakup with B.B.

173.    Herschkorn, for example, knew that A.A. was a "vulnerable kid, in a vulnerable moment," who was "[a]t risk for depression" and had experienced "[p]ast suicidal ideation."

174.    As of the morning of December 18, 2017, Defendants knew or plainly should have known that A.A. was a suicide risk and needed urgent and immediate psychological attention, and at minimum urgent and immediate *human* attention from an adult in the District.

175.    Defendant Manno testified that it would "shock" him if "not a single adult reached out to [A.A.] to speak with him the entire day" of his death.[2]

176.    Yet not one Defendant or District employee reached out to A.A. to see, speak, or meet with him the entire day of his death.

177.    Defendant Herschkorn acted with bad faith and gross misjudgment when she failed to see, meet, speak with, or attempt to see, meet, or speak with A.A. on December 18, 2017.

178.    Defendant Quinn acted with bad faith and gross misjudgment when he failed to see, meet, speak with, or attempt to see, meet, or speak with A.A. on December 18, 2017.

---

[2] All quotations are true and correct excerpts from the deposition transcripts of the individual Defendants or from documents produced in this matter.

179.    Defendant Ostrofsky acted with bad faith and gross misjudgment when she failed to see, meet, speak with, or attempt to see, meet, or speak with A.A. on December 18, 2017.

180.    District employee Mary Harrison acted with bad faith and gross misjudgment when she failed to see, meet, speak with, or attempt to see, meet, or speak with A.A. on December 18, 2017.

181.    Not one District employee (including the Defendants) counseled, or attempted to counsel, A.A. on December 18, 2017.  This failure also reflected the District's bad faith and gross misjudgment.

182.    Defendants were also aware of A.A.'s public meltdown in the cafeteria, what Defendant Herschkorn called a "blowout."  Yet Defendants failed to inquire, or even attempt to inquire, with any of the lunch aides or adults in the cafeteria as to what happened, or as to A.A.'s fragile mental state.  Had Defendants bothered, they would have learned from lunch aide Nancy Placona that A.A. came to lunch "very, very upset," "distressed" and "so distraught," "very frantic," "incredibly agitated," and "aggravated"; that he was "very anxious," "at wits' end," and "slamming his books on [Ms. Placona's] desk" with "erratic . . . behavior"; and that he was "ranting" in a "very loud voice," and "yelling that . . . nothing made any sense" and that "this is very bad."

183.    Defendants' knowing failure to speak, or attempt to speak, with a single adult who witnessed A.A.'s meltdown, exhibited further bad faith, gross misjudgment, and total lack of concern for A.A.'s health and well-being.

184.    Defendants also failed to inquire with *any* District employee who saw or interacted with A.A. on December 18, 2017 as to A.A.'s instability, volatility, lack of control,

dysregulation, or mental or emotional state.  This knowing failure exhibited further bad faith, gross misjudgment, and total lack of concern for A.A.'s health and well-being.

185.    On December 18, 2017, before she spoke with John Doe or Jane Doe, Defendant Herschkorn received and read a 6:34 a.m. email from the mother of B.B. which described A.A.'s "extreme volatility."

186.    On December 18, 2017, before she spoke with John Doe or Jane Doe, Defendant Herschkorn received and read a 6:34 a.m. email from the mother of B.B. which described her "concerns . . . about [A.A]'s stability."

187.    Defendant Herschkorn admitted that if she "had been told that [A.A.] were extremely volatile," she "should . . . have told [A.A.]'s parents that [A.A.] was extremely volatile."

188.    Defendant Herschkorn admitted that if she "had been informed that [A.A.] was unstable . . . [she] should have told that to [A.A.]'s parents."

189.    Defendant Herschkorn *was* informed (via email), but neither Herschkorn nor anyone in the District informed A.A.'s parents that A.A. was volatile.

190.    Nor did Defendant Herschkorn or anyone in the District inform A.A.'s parents that A.A. was unstable.

191.    Principal Ostrofsky knew the above, read the 6:34 a.m. email, read A.A.'s profane email forwarded to the school at 7:52 a.m., yet did nothing to ensure A.A.'s parents were informed by anyone about the existence or content of either of those emails.

192.    Defendants' failure to inform Plaintiffs that A.A. was volatile, unstable, spiraling out of control, and in need of immediate emotional help, after having received an email

stating that he was volatile, unstable, and out of control, represented bad faith and gross misjudgment.

193.    With bad faith and gross misjudgment, Defendants also knowingly failed to inform Plaintiffs that B.B.'s mother had written seven emails (or any emails) to Defendant Quinn prior to A.A.'s death on December 18, 2017 expressing her concern about A.A.'s mental state.

194.    With bad faith and gross misjudgment, Defendants also knowingly failed to inform Plaintiffs about a profane, angry, and uncharacteristic email that A.A. sent to B.B. the night before he died, even though Defendant Quinn read it, Defendant Ostrofsky read it, other District employees read it, and Quinn either read or paraphrased the email aloud to Defendant Herschkorn well in advance of A.A.'s death and Defendant Herschkorn's calls to Plaintiffs.

195.    With bad faith and gross misjudgment, Defendants also knowingly failed to inform Plaintiffs that A.A. had written a series of angry emails to B.B., even though B.B.'s mother so informed the District in her 6:34 a.m. email, and District employees including Quinn, Ostrofsky, and Herschkorn read the 6:34 a.m. email well in advance of A.A.'s death and Defendant Herschkorn's calls to Plaintiffs.

196.    This conduct, and the conduct hereinbefore alleged, reflected a failure to follow and implement A.A.'s IEP, bad faith and gross misjudgment, and in Superintendent Manno's words, "shock[ing]" failures—all of which proximately caused A.A.'s death.

197.    As a direct and proximate result of the bad faith and gross misjudgment of Defendant Bedford Central School District, A.A. sustained the damages hereinbefore alleged.

## COUNT SEVEN
(Medical Malpractice Against Defendant Helayna Herschkorn)

198.    Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in the foregoing paragraphs.

199.    At all relevant times, Defendant Herschkorn was employed by Fox Lane Middle School as a school psychologist.

200.    Defendant Herschkorn testified that she received a doctorate degree in psychology prior to her employment at Fox Lane Middle School

201.    At all relevant times, Defendant Herschkorn undertook to provide medical care to students in her care at Fox Lane Middle School, including A.A., and was legally obligated and had a special duty to do so competently and effectively, above and beyond her duties as a District employee assigned to counsel A.A.

202.    At all relevant times, Defendant Herschkorn was responsible for implementing A.A.'s IEP.

203.    Defendant Herschkorn testified that "part of [her] job was to provide direct mental health services to children" (including "school based counseling" and implementing "both preventive and remedial interventions for students including [A.A.]"), to "provide supportive services to parents," and "to consult with administrators and teachers regarding the mental health needs of middle school students including [A.A.]."

204.    Defendant Herschkorn held herself out as possessing the proper degree of learning and skill necessary to render medical care, treatment, and services in accordance with good and accepted medical practice, and as undertaking to use reasonable care and diligence in the care and treatment of Fox Lane Middle School students, including A.A.

205.    By reason of the foregoing, including but not limited to her failure to see, meet, speak with, or attempt to see, meet, or speak with A.A. on December 18, 2017; her failure to do a safety assessment of A.A.; her failure to ensure that any adult met with A.A. or did a safety assessment; her failure to inquire with District employees (including the lunch aides) as to A.A's condition; her failure to inform A.A.'s parents about his volatility, instability, lack of control, or need for help; her failure to inform A.A.'s parents about B.B.'s mother's concern for A.A.'s mental state, or the fact or substance of her emails; her failure to inform A.A.'s parents about A.A.'s series of angry emails to B.B.; and her failure to inform A.A.'s parents about A.A.'s profane, angry, unstable, and uncharacteristic email to B.B. the night before he died, even though Defendant Quinn had either read that email aloud to her or paraphrased its contents in advance of A.A.'s death, Defendant Herschkorn was negligent and careless, acted contrary to sound medical practice, and committed acts of medical malpractice against A.A.

206.    As a direct and proximate result of Defendant Herschkorn's medical malpractice, negligence, carelessness, and unskillfulness, A.A. suffered the damages hereinbefore alleged.

207.    As a result of the foregoing, A.A.'s estate is entitled to recover compensatory and punitive damages in an amount to be determined at trial.

208.    A certificate of merit pursuant to Section 3012-a of the New York Civil Practice Law and Rules is annexed to Plaintiffs' First Amended Complaint.

## JURY TRIAL DEMANDED

209.    Plaintiffs demand a trial by jury.

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

    a.   compensatory damages in an amount to be determined at trial;

    b.   punitive damages in an amount to be determined at trial;

    c.   reasonable attorneys' fees, costs and disbursements pursuant to the Civil Rights Attorney's Fee Awards Act of 1976, 42 U.S.C. § 1988, and the Rehabilitation Act of 1973, 29 U.S.C. § 794a(b); and

    d.   such other and further relief as this Court deems just and equitable.

Dated: New York, New York
       December 18, 2020

                EMERY CELLI BRINCKERHOFF
                ABADY WARD & MAAZEL LLP

                By: _____
                      Ilann M. Maazel
                      Emma L. Freeman
                      600 Fifth Avenue, 10th Floor
                      New York, New York 10020
                      (212) 763-5000

                *Attorneys for Plaintiffs Jane and John Doe*